Warden, J.
At the July term, 1851, the plaintiff in error was tried on an indictment containing three counts, two for resisting and abusing an officer in the execution of his duty, and one for simple assault and battery on the same person.
Evidence was offered tending to prove the following state of facts:
The plaintiff in error put .into the hands of Bacon, a constable, an execution for $10.47, against one Clark as principal, and plaintiff in error as surety, directing him to make the amount out of Clark’s property. No property of Clark was found within the township; but he promised to bring out of another township, and subject to levy, a two-horse wagon. Though he did not keep this promise, he paid the constable ten dollars and twenty cents, and .the latter retained the execution for some time, on his assurance that he would pay the balance. The officer says that before the time of the execution expired he returned it to the justice, with his return, dated November 11, 1850, showing how much money he had made. The justice altered the date of the writ from October to January, and re-issued it. The bill of exceptions does not profess to contain all the testimony; but what appears indicates that the writ must have been retained until after the return day, notwithstanding the officer’s declaration to the contrary. Be that, however, as it may, it can not affect the questions now before the court; no motion for a new trial having been made, and all the evidence not being shown by the record.
On the 24th of January, 1851, in the absence of the plaintiff in error, the constable levied on a load of corn, believing, as he swears, that it was Clark’s property, and having been informed that it was such by another witness. That other witness testifies that *161 he met plaintiff in error before the levy, and the latter told him that the corn was Clark’s, and that he (Faris) was hauling it to market for Clark. On the other hand, Clark testifies that before 161] the levy, he had sold the *corn to Faris, on account of a previous indebtedness of about six dollars. And when, after the levy had been made, the constable met Faris, the latter insisted that the corn was his, not Clark’s, of whom, he said, he had bought it. The constable, having informed Faris qf the fact that he had levied on the corn as Clark’s, left the corn to get another team to haul it away. On his return, seeing the defendant driving the load away, the constable followed him, claimed the corn under the levy, and reiterated the claim, in answer to the declaration of Faris that the corn was his, and that he would not give it up. Faris refusing to stop, as ordered, the constable seized his horses’ heads; Faris tried to drive on, and, not suecee'ding, went forward on the tongue of his wagon and struck witness with his whip. The constable making a second attempt to stop the wagon, Faris got off his wagon, struck the constable with his whip and fist, and kicked him, aud finally drove off the corn. '
On this and other testimony (some of which tended to contradict it, and some to show that Clark had other property subject to seizure, though not within the officer’s knowledge), the counsel for Faris asked the court to charge the jury as follows:
“ 1. That if the constable went beyond his legal duties, he was a trespasser; and that when a constable was a wrong-doer, he had no further rights than any other individual.
“ 2. That if the principal in the execution mentioned had, at the time said execution was first placed in the hands of the said constable by the defendant, sufficient property that said constable could have got to satisfy the sam'e, or if said constable had made any agreement with said Clark to wait on him for the money, and did not make a levy, that the constable was liable for the debt, and had no right to have a second execution for his own benefit.
“ 3. That under the indictment in this case, and the return of said constable on said writ so used as evidence’, the plaintiff had no right to any benefit from the fact that said execution was against the defendant as bail.
162] *“ 4. That the constable, before he could legally levy upon the property, should know that it was the property of the judgment debtor.
*163 “ 5. That the writ upon which said constable acted, and which is hereto attached as a part of this bill of exceptions, was not a sufficient writ to authorize said constable to levy upon property of [the] judgment debtor on the 24th day of January, a. d. 1851.”
“ Which instructions the court refused to give (says the record) in the form requested, but did direct the jury, in substance, as in the first request made, that a constable was bound to act within the limits of his authority; and that, in a proper state of fact, he was liable in law for exceeding his authority.”
The court further charged the jury as follows:
“ That if the corn was in fact the property of Clark, and the constable knew or had good reason to believe that it was Clark’s corn, and in the honest discharge of his official duty had made the levy, believing it to be the property of Clark, the defendant would not, under such a state of fact, be justifiable in resisting the constable, by force or assault, thereby to prevent him from executing his duty, even though, upon investigation afterward, it should be found to be the property of defendant, and not Clark’s.
“ That, although it would have been better for the justice of the peace to have written and delivered a new writ to the constable, yet the» re-delivery was a sufficient issuing of the writ to protect the constable on the said 24th day of Jannary, 1851, in levying on the property of said Clark, and against the assault of said defendant after he had made the levy.
“ That if said Clark, at the time said constable first had the said execution in his hands, had property sufficient to make the amount of said execution, that was in the power and jurisdiction of the constableand if, at the request of Clark, the constable waited on him, or on his promise to raise and pay the money due on the execution, and did not make *a levy, whereby the amount [163 was not made on the first execution until after return, through the constable’s neglect, [though the constable might thus become] “ liable to the plaintiff in execution for failing to execute the writ, the defendant thereby acquired no justification in law in resisting him by an assault, after he had levied on property under the second execution to make the mopey still unpaid.”
The first instruction asked, must be considered as having been substantially given.
The second was rightly refused. Though a constable or sheriff may render himself liable to the plaintiff in execution by failing to *164 make a levy or return, within the time limited by law, the principal defen dant.in execution can not object to the levying of a second execution, nor certainly can the surety object, when it is not sought ■ to levy the execution on any property other than that of the principal. The officer would have a right to the execution even after amercement; a fortiori may he execute the writ against the principal debtor in a case like the present, where it does not appear that the plaintiff in execution made any complaint whatever.
The third instruction prayed was immaterial. No attempt was made to levy on the property as that of the bail.
The fourth could not have been properly given. It is unnecessary to the validity of a levy that the officer levying on the property of a judgment-debtor should know it to be his; it is enough that it is in fact the debtor’s property. But the court below did not confine itself to refusing this charge, as asked. The jury was instructed, in substance, that if the constable had good reason to believe that the property in question was that of Clark, and levied on it, in the honest discharge of his duty, and under a reasonable belief that it was Clark’s, Faris was not justifiable in resisting him by force or assault, although upon investigation afterward, the property should be found to belong not to Clark, but to Faris.
Ifi4] *The insignificance of the interests involved in the controversy, out of which grows the question here presented, stands in striking contrast to the importance of that question itself, considered in its relation to public policy. The obstruction of an officer in the execution of process, is a grave offense against public justice; but it is likewise matter of just concern to protect the citizen from unjustifiable seizures of person or property. To. officers charged with the duty of making the amount of judgments by seizures of property, a right decision of such a question as that raised by the instruction given to the jury in this case, is matter of such moment, that no court can approach it without a sense of its difficult and delicate nature.
Though few authorities have been cited, and few analogous eases can be found, this question is not wholly a new one.
Two decisions in the State of Yermont, are in favor of the ruling of the court below, while one in Massachusetts and another in Illinois, may be considered as opposed to it. No precedent, which this court is absolutely bound to follow, is within our knowledge.
In one of the Vermont cases (State v. Downer, 8 Vt. 824), it was *165 held, that “if an officer attach personal property in good faith, which in fact did not belong to the person on whose debt he made the attachment, still it is not lawful for the owner of the property even to resistí the attachment, but he must resort to the action at law.” And the second case in the Vermont Reports (State v. Miller, 12 Vt. 437), while it makes a nice, but true and necessary distinction between the facts which would make an entire stranger guilty of impeding and hindering the officer in making a seizure of property, and those which will render the owner guilty, fully sustains the doctrine of the former case.
On the other hand, an opposite doctrine seems to be contained in Commonwealth v. Kennard, 8 Pick. 135, Parker, C. J., delivering the opinion. That case is, indeed, clearly distinguishable from the present, so far as the degree of violence *used by the owner [165 in defending his property is concerned; and if this case stood upon the count for assault and battery alone, I should regard it as quite reconcilable with the conclusion to which we have been brought in our examination of this case. But, fairly considered, the opinion of O. J. Parker is apparently opposed to that of Justice Red-field, in the case first cited. It is said by C. J. Parker: “We have had no authorities cited on the part of the commonwealth, which have any tendency to show that the owner and possessor of goods may not defend them against an officer who comes to seize them as another person’s. That a man may defend his person, his lands, or goods, against the intrusion or invasion of those who have no lawful authority over them, would seem entirely unquestionable. If the officer believes the possession is only colorable, and the claim of the property fraudulent, if backed by the creditor’s orders, or secured by bond of indemnity, he will take care to be so attended as to be protected against insult in the execution of his precept.” Here seems to be a full recognition of the owner’s right to resist the attachment of his goods as the property of another; and while the caution of1 the court that “ this decision will form no precedent for cases which may be differently circumstanced,” and its careful limitation of the lawful resistance to such as shall fall “short of injurious violence to the officer,” ought not to be overlooked, it must still be allowed that this decision is not quite reconcilable with that in Vermont.
A case decided by the Supreme Court of Illinois (Wentworth v. The People, 4 Scam. 550), may also appear in conflict with the *166 opinion of the Vermont court; but the conflict is not real. In the case last cited, it does not appear that the officer had any belief, or any reason to believe, that the goods were not those of the person who had them in possession.
With the greatest respect for the high character and abilities of Chief Justice Parker, we shall find some good reasons for prefer-166] ring the doctrine of the Vermont court. If, to mention *one of several objections to the reasoning of Chief Justice Parker, the owner has the right to defend his goods against an attaching officer who attempts to take them as another’s, it does not seem very clear that the officer, however backed or provided with indemnity, can be justified in securing such attendance as to be protected from insult in the execution of his precept; nor can I understand, indeed, how, consistently with the doctrine of Kennard’s case,, it can be said that, in the given instance, there can be any precept whatever to execute, to say nothing of the obvious right of the owner himself to have an attendance in defending his possession equal to the force brought against it. But is it not singular, that in a case upholding the right of the owner to resist the officer, while unattended, the suggestion should be made that the officer may, by an appeal to the power of the county, overawe the owner so as to prevent him from asserting the very right recognized ? And yet such is our understanding of the whole effect of the opinion in Kennard’s case.
When the nature of the question, and the history of the rulings on the subject of defending person and property, which have illustrated the advancement of the common law from rade and barbarous to refined and enlightened civilization, are clearly taken into view, we shall find the reasoning of Justice Redfield altogether safe, and exactly in harmony with the system of government and society to which it is applied. “It is well settled,” says the justice, “that one may defend the possession of his property against a stranger with such force as may be necessary. But this right can not be extended to the' case of an officer, whose duty it is to attach property whenever he is requested so to do. He may, or may not, require indemnity for the act. But it would be too much to say that he must decide all cases of doubtful property at his own hazard, or that if he attempted to make an attachment when the property was not, in fact, in the debtor, he might, by the owner of the property, be resisted to any extremity. The rule would be the *167, 168 same when he called out the posse comitatus, and the question, whether the ^officers of justice,.or the rioters, shall be held [167 liable to indictment, must depend upon the decision of some abstract question of property, which the sagacity of no man was sufficient to foresee. And if the owner of property may resist an officer in its defense, so may one who believes himself the owner ; for it will not do to predicate crime upon so subtle a distinction as an abstract right of property. It must be something more tangible.”
Whatever may have been the necessity for resistance to an officer in other lands and times, there is at this day, and in this country, no want of the peaceful protection of property against a seizure made in good faith by one clothed with public power, and subject to public responsibility. Nor is there any want of quiet, safe, and sure means, to recover it when so taken. While the rule of stare decisis is the great safety of rights subject to judicial decision, maxims, and regulations fitted to a former state of society and government are not to be preserved and forced into an unnatural application, when and where the very conditions necessary to them when established, have long since passed away. If, therefore, it were clear that the early decisions, or even the present adjudications of English courts are opposed to this Yermont decision — and such is far from the truth — we should still regard the doctrine of Downer’s case as the only one which we ought to adopt, as applicable to our government and people. It must be familiar to all, that, while the tendency of the best and highest American decisions, as well as the very genius of our government, are favorable to an increased regard for the sanctity of the person, by the same law, many measures of defense as to property have become obsolete and shocking to the enlightened humanity of the day. If the rule that one must retreat to the wall before killing his assailant has passed away, so has the day of man-traps and spring-guns. If an officer may be resisted to the death to prevent an unauthorized and disgraceful seizure of the person — and so some courts have been disposed to hold— *the mere taking of a few bushels of corn, by mistake, is not [168 to subject a constable to a horsewhipping.
Surely, a seizure of property by an officer, in good faith, and on good ground for that faith, apparent to the owner of the property as such, although the property be erroneously, supposed to belong to another, will not justify the owner in a resort to personal violence. An officer is, so far as his motives or his right to protec *169 tion are concerned, none the less in the execution of his duty when he seizes property in good faith, and with reason for his belief, as belonging to A, because it happens, in fact, to belong to B. He is not infallible, nor does the law expect him to be so ; it only demands that he shall be honest, and not wantonly trample on the rights of others. It may be allowed that, in the seizure, he is a trespasser, and liable in damages as such; but if he is following'his convictions of duty, he must be regarded as in the execution of his office, so far as to be entitled to protection against the violence of the owner of property which he subjects to seizure! The owner may, if he can, peaceably prevent the taking of his property; and such peaceable prevention will not amount to unlawful resistence or abuse; but he can not be allowed to forget the rights and responsibilities of the officer, so far as to “ abuse ” his person. It ought to be remarked that the case in Pickering — decided in 1829 — passed in review in Downer’s case, which was decided in 1836.
We hold, then, “ the better and safer, and only practicable rule , to be, that whenever the question of property is' so far doubtful that the creditor and officer may be supposed to act,” and do in truth act, in good faith, and on reasonable grounds for believing the property to be that of the debtor, the owner has no right to resist the execution or attachment by a breach of the peace.
The fifth instruction asked, supposes the execution under which the levy was made to have been a nullity. We can not so regard' it. It was irregular, but not void. The destruction of the first ex-169] ecution issued on a judgment, *would not affect the validity of a second execution nor can its conversion into an alias writ, by a mere change of date (however irregular such a proceeding on the part of the magistrate was), affect the protection due to the constable to whom it was delivered.
We find no error in the refusal to give instructions, or in the charge as made, which would warrant a reversal of this judgment.
The motion in arrest of judgment remains to be considered.
It is said the first two counts of the indictment are bad. They are said- to be double, and to be uncertain.
They are as follows:
I. “That one Mortimer Faris, late of the county of Morrow aforesaid, heretofore, to wit, on the 24th day of January, in the year of our Lord 1851, with force and arms, at the township of Cardington, in the county of Morrow aforesaid, in and upon one *170 Roland C. Bacon, he, the said Roland C. Bacon, then and there being a constable within and for the township of Cardington aforesaid, in the county of Morrow aforesaid, legally authorized to act as such, and then and there having in his possession, as constable aforesaid, a certain writ, commonly called a fieri facias, which writ was duly issued by John Andrews, then and there being an acting justice of the peace within and for the township of Cardington, in the said county of Morrow, and then and there being duly authorized to act as such justice of the peace, by which writ the said Roland O. Bacon was rightfully and legally commanded to levy upon the goods and chattels of one Watson Clark, as principal debtor, and for want thereof, upon the 'goods and chattels of one Mortimer Earis, as bail, to satisfy a certain judgment rendered by said John Andrews, as justice of the peace as aforesaid, against the said Watson Clark, as principal debtor, and said Mortimer Earis as bail, as therein said writ specified; which writ is in the words and figures following, to wit:
* “ The State of Ohio, Morrow County, ss. [170
“ To any Constable of Cardington Township, greeting:
“Whereas, E. McGregor, administrator of C. C. Sloan’s estate, obtained judgment against Watson Clark as principal, and Mortimer Earis as bail, before me, John Andrews, a justice of the peace in and for the township aforesaid, for the sum of $10.47, and costs assessed at 50 cents, on the 9th day of October, 1850. You are therefore commanded, that of the goods and chattels of the said Watson Clark, principal debtor, you cause to be made the debt and costs aforesaid, with interest and costs that may accrue, and for want of goods and chattels of said principal, you make the same of the bail; and of this writ make legal service and due retarn.
“ Given under my hand and seal, this 9th day of January.
“John Andrews, J. P. [seal.]”
‘And the said Roland C. Bacon, being then and there in the due execution of the office of constable as aforesaid, in and about the-execution of said writ upon the goods and chattels of the said Watson Clark, did then and there unlawfully assault, abuse, and • ill-treat, and did then and there resist and abuse the said Roland C. Bacon in the execution of his office of constable as aforesaid, to wit, in the execution of the writ aforesaid, and other wrongs to the said Roland C. Bacon, then and there did to the great damage of the said Roland C. Bacon, contrary,” etc.
*171 II. “That one Mortimer Paris, late of the county of Morrow aforesaid, heretofore, to wit, on the 24th day of January, in the year of our Lord, 1851, with force and arms, at the township of Cardington aforesaid, in the county of Morrow aforesaid, in and upon the person of one Robert C. Bacon, then and there being an officer, to wit, a constable within and for the township of Carding-ton aforesaid, in the county of Morrow aforesaid, and legally authorized to act as such, then and there being in the due execution of the office of constable, as aforesaid, by executing a certain writ of fieri facias upon the goods and chattels of One Watson Clark, did unlawfully assault, resist, and abuse him, the said Robert C. Bacon, in the execution of his office of constable, as aforesaid, then and •there did unlawfully strike, beat, wound, resist, abuse, and ill-treat, 171] and other wrongs to the said *Robert C. Bacon, then and there did, to the great damage of the said Robert C. Bacon, against the form of the statute in such case made and provided, and against •the peace and dignity of the State of Ohio.”
These counts are certainly not bad for duplicity; their defects •are of an opposite character; they probably do not contain enough to satisfy the law of criminal pleading. In Lamberton v. The State 11 Ohio, 288, it was held that an indictment for resisting an officer 5n the execution of his duty, must sot forth all the facts necessary ■to constitute the offense. Among other things, the court requires :the writ to be set forth, if not in haec verba, at least in substance. .And in the case already cited from 8 Vermont,'it is said, that “the process should have been so far set foi’th, that the court could see •that it was legal, and that the officer had authority to serve it. All •the authorities, too, concur in requiring that the bill should contain ;an allegation of the particular mode of resisting the officer. And •no doubt the mode in which the process was attempted to be ex•ecuted should be specifically set forth. And it should be alleged ■that the respondents knew of the character in which the officer •claimed to act.” On the other hand, the English indictments, and the authorities and precedents in the United States federal courts, are against this strictness.
While .the rule laid down in Lamberton’s case, 11 Ohio, 282, * would seem to support the ruling in Vermont, we do not,feel •obliged, in this case, to fix the absolutely necessary requisites of an indictment for resisting an officer. There was a general verdict .of guilty; and the third count of the indictment was for a simple *172 assault and battery. The sentence was for a fine such as the court would be authorized to inflict for the offense defined in the third count. Even, therefore, if we should find the first and second counts defective in substance, the good count would support the verdict and judgment.
The judgment must be affirmed.